**Charlie HARRIS and Mose Batie, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Charles A. GRADDICK, in his official capacity as Attorney General of Alabama, et al., Defendants.**

**Civ. A. No. 84–T–595–N.**

United States District Court, M.D. Alabama, N.D.

Aug. 1, 1984.

---

James U. Blacksher, Larry T. Menefee, Blacksher, Menefee & Stein, Mobile, Ala., Delores Boyd, Mandell & Boyd, Terry Davis, Montgomery, Ala., Jack Greenberg, Carol Guinier, New York City, for plaintiffs.

Joseph E. Faulk, Troy, Ala., for Powell and Anderson.

Charles A. Graddick, Atty. Gen., Philip C. Davis, Susan McKinney, Albert S. Agricola, Callen Sparrow, Asst. Attys. Gen., Montgomery, Ala., for Stone, Graddick & Wallace.

Edward Still, Birmingham, Ala., for State Democratic Exec. Committee.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiffs Charlie Harris and Mose Batie are black citizens of the State of Alabama, qualified to vote in Pike County, Alabama. They filed this lawsuit on April 30, 1984, on behalf of themselves and others similarly situated throughout the state, claiming that county officials across the state appoint disproportionately too few black persons as poll officials, in violation of section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973 (West Supp. 1983).[1] The named defendants are the Governor of the State of Alabama, the State Attorney General, the State Democratic Executive Committee, and the Pike County officials responsible for appointing poll officials for the county. The court's

jurisdiction has been properly invoked pursuant to 28 U.S.C.A. §§ 1331, 1343.

There are now three principal matters before the court: (i) the plaintiffs' request for a preliminary injunction requiring that state and county officials increase the number of black poll officials for the upcoming September 1984 primary elections and November 1984 general election; (ii) their request for certification of a plaintiff class of all black citizens of the state; and (iii) their request for certification of a defendant class of county officials responsible for the appointment of poll officials for primary, general, and special elections. These requests were submitted to the court for decision on July 9, 1984. For reasons which follow, all three requests are due to be granted.

## I. BACKGROUND

Black citizens of the State of Alabama have a long and immediate history of being subjected to open and official racial discrimination from their cities, their counties and their state. This discrimination, as documented in reported court cases from the former Fifth and new Eleventh Circuits, has manifested itself in practically every area of political, social, and economic life. *See e.g., Buskey v. Oliver,* 565 F.Supp. 1473 (M.D.Ala.1983) (city districting plan adopted for racially discriminatory purpose); *Bolden v. City of Mobile,* 542 F.Supp. 1050 (S.D.Ala.1982) (at-large voting for city commissioners adopted with racially discriminatory purpose); *Smith v. Y.M. C.A.,* 316 F.Supp. 899 (M.D.Ala.1970), *aff'd as modified,* 462 F.2d 634 (5th Cir.1972) (racial segregation in youth recreational facilities); *United States v. Alabama,* 252 F.Supp. 95 (M.D.Ala.1966) (three-judge court) (poll tax adopted to disenfranchise black voters); *Sims v. Baggett,* 247 F.Supp. 96 (M.D.Ala.1965) (three-judge court) (state House of Representatives districts drawn to discriminate against black voters); *Unit-*

---

1. The plaintiffs also rest their claim on the thirteenth, fourteenth and fifteenth amendments to the U.S. Constitution. In view of the preliminary disposition of their claim under section 2, the court does not at this time reach whether their claim has merit directly under the three constitutional amendments.

ed States v. Parker, 236 F.Supp. 511 (M.D. Ala.1964) (voter registration procedures adopted to discourage black voting); *Lee v. Macon County Bd. of Education,* 231 F.Supp. 743 (M.D.Ala.1964) (three-judge court) (state maintained racially segregated schools); *United States v. Penton,* 212 F.Supp. 193 (M.D.Ala.1962) (racial discrimination in voter registration procedures); *Lewis v. Greyhound Corp.,* 199 F.Supp. 210 (M.D.Ala.1961) (racial segregation of long distance buses and terminal facilities); *Browder v. Gayle,* 142 F.Supp. 707 (M.D. Ala.) (three-judge court), *aff'd mem.,* 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956) (racial segregation of city buses required by state statute and city ordinance). As was stated not too long ago by the late Judge Richard T. Rives,

> from the Constitutional Convention of 1901 to the present, the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society.

*United States v. Alabama,* 252 F.Supp. at 101.

Therefore, many black citizens of the state have lived great portions of their lives under state and local governments that treated them as inferior citizens who were not to participate in the political, social, and economic life of the state. Moreover, as anyone casually familiar with the history of the state knows, this rule of law and social order was usually enforced by humiliation, intimidation and even violence.

The evidence now before the court dramatically and persuasively reflects that many blacks, in particular the elderly and the uneducated, still labor under these past memories of personal humiliation, intimida-

tion and violence. They understandably still harbor strong fears of entering all-white public places, even though they are now legally entitled to do so. They find the simple act of registering and voting, especially when the voting officials are all white, an extremely intimidating experience; and as a result, many of them do not register, and many of those who do register do not vote.[2] For these persons, the political process is still not open, is still not available to the same extent it is and has been available to white persons.

The evidence before the court further reflects that the presence of black poll officials, those responsible for conducting the operations at a polling place, goes a long way toward allaying these fears and opening up the political process to those suffering from such fears. The open and substantial presence of black poll officials, according to the evidence, is a significant indication to many black persons that voting places are now open to all, that black persons not only have a legal right to come and vote, *they are welcome.* And, of course, the more black poll officials there are, the greater the confidence black persons will have in the election process, and the less fear they will have about participating in that process.[3]

Nevertheless, the evidence before the court reflects that across the state black persons are grossly underrepresented as poll officials. Data from the last statewide election, gathered by the plaintiffs, show that *in at least 36*[4] *of Alabama's 67 counties the percentage of black poll officials ranged from one-half to substantially less than one-half of the percentage of blacks in the county population.*[5] Fur-

2. Also, the elderly and uneducated black persons are most likely to need assistance from poll officials. Thus, they must rely on poll officials even more than other black persons.

3. The plaintiffs have presented substantial evidence detailing recent unpleasant encounters between black voters and white poll officials. Because of past memories, these recent experiences are to many black persons an indication that while the law may have changed, racial customs and practices have not, with the result

that many of these persons do not venture to vote again.

Again, according to the evidence, the presence of black poll officials would do much to encourage such voters to return to polls in future elections.

4. The data do not include all 67 counties.

5. One county with a black population of 26.2% had no black poll officials.

thermore, the evidence reflects that, among poll officials, disproportionately far fewer blacks serve as chief inspector, chief clerk and returning officer.

Poll officials are selected in each county by an appointing authority composed of the county probate judge, the county sheriff, and the clerk of the circuit court of the county. 1975 Ala.Code § 17–6–1. For both primary and general elections, the appointing authority appoints poll officials from lists provided by the chairpersons of the state or county executive committees conducting primaries or nominating candidates for election. 1975 Ala.Code §§ 17–6–6 (general election), 17–16–17 (primary election).

## II. REQUEST FOR PRELIMINARY INJUNCTION

In order for a preliminary injunction to issue, a district court must be satisfied that a plaintiff has clearly met all of the following four prerequisites: (1) that there is a substantial likelihood of success on the merits; (2) that without the relief there will be irreparable injury; (3) that the threatened injury to the plaintiff outweighs any threatened harm to the defendant; and (4) that the public interest will not be disserved by granting the injunctive relief. *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.,* 697 F.2d 1352, 1354–55 (11th Cir. 1983). As demonstrated below, the plaintiffs have met all four prerequisites.

### A. Substantial Likelihood of Success on the Merits

The plaintiffs claim that the appointment of only low numbers of black poll officials violates section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973 (West Supp.1983). Based upon the evidence now before the court, the court finds that there is a substantial likelihood that the plaintiffs will prevail on this claim.

■ Section 2, as recently amended, prohibits any "practice or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C.A. § 1973(a) (West Supp.1983). The amending of the section substantially broadened the area of violations falling within its proscription. The section prohibits not only official action taken or maintained for a racially discriminatory *purpose,* it prohibits any official action that *results* in the impairment or denial of the right of any citizen on account of race. *United States v. Marengo County Commission,* 731 F.2d 1546, 1552–53 (11th Cir. 1984). Thus, "discriminatory intent need not be shown to establish a violation." 731 F.2d at 1564.

■ Furthermore, the proscription of section 2, as amended, extends beyond formal barriers to access such as literacy and residency tests. The section is violated merely "if a protected class has 'less opportunity than other members of the electorate to participate in the political process. . . .' " 731 F.2d at 1556 (*quoting* 42 U.S.C.A. § 1973(b) (West Supp.1983)). As the Senate Report recognized,

> Section 2 remains the major statutory prohibition of all voting rights discrimination. It also prohibits practices which, while episodic and not involving permanent structural barriers, result in the denial of equal access to any phase of the electoral process for minority group members.

S.Rep. No. 417, 97th Cong., 2d Sess. 30, *reprinted in,* 1982 U.S.Code, Cong. & Ad. News 177, 207. In short, section 2 is violated if the result of a practice is that minority voters cannot participate in the electoral process on the same terms and to the same extent as non-minority voters.

■ Section 2's reach, therefore, includes everything from districting schemes that dilute minority voting strength, *see, e.g., United States v. Marengo County Commission, supra,* to "refusal to appoint minority registration and election officials," H.R.Rep. No. 227, 97 Cong., 1st Sess., 14 (1981).

■ In determining whether a challenged practice results in impaired minority access to the political process, a court is

required by section 2, as amended, to examine the "totality of the circumstances." 42 U.S.C.A. § 1973(b). In other words, a court must engage in "a searching practical evaluation of the 'past and present reality.'" S.Rep. No. 417, 97th Cong., 2d Sess., 30, *reprinted in*, 1982 U.S.Code, Cong. & Ad.News 177, 208.

The past reality in Alabama has been that black citizens of the state were not only prohibited from participating in the political process, they were taught that this was the rule of law and society, the transgression of which merited severe punishment. In effect, state and local governments intentionally created an atmosphere of fear and intimidation to keep black persons from voting.

The present reality in Alabama is that many black citizens, in particular the elderly and uneducated, still bear the scars of this past, and are still afraid to engage in the simple act of registering to vote and voting. However, these fears can often be substantially allayed by the open and substantial presence of other black persons in the role of poll officials at voting places. Nevertheless, black persons are grossly underrepresented among poll officials, with the result that polling places across the state continue to be viewed by many blacks as areas circumscribed for whites and off-limits for blacks.

On this past and present record now before the court, the preliminary conclusion is inescapable that this underrepresentation is substantially impeding and impairing the access of many black persons to the political process, in violation of section 2.[6]

This preliminary conclusion is further supported in part by a recent Eleventh Circuit case from Alabama. In *United States v. Marengo County Commission, supra,* the appellate court recognized, first,

that "past discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause blacks to register or vote in lower number than whites." 731 F.2d at 1567. The court then went on to recognize the need for the presence of substantial numbers of black poll officials to offset this impairment: "By having few black poll officials and spurning the voluntary offer of a black citizen to serve as a registrar, county officials impaired black access to the political system and the confidence of blacks in the system's openness." 731 F.2d at 1570. Similarly, the district court in *Marengo* noted the importance of black poll officials in the electoral process:

> [The plaintiffs] contend that it is important to have black poll officials so that black voters will have more confidence in the electoral system. The evidence before the Court reflects that the assertions of the plaintiffs with respect to appointments are to a large extent true.

*Clark v. Marengo County,* 469 F.Supp. 1150, 1161 (S.D.Ala.1979).

The next issue for the court is therefore the appropriate relief. The fear and intimidation with which many blacks view voting places were wrought by race-conscious acts of state and local governments to keep blacks from participating in the political process; it will therefore require race-conscious acts of state and local government officials to change the way these persons view voting places, by requiring that local government officials, with the assistance of state government and political officials, take affirmative steps to bring a greater number of black persons into the official operation of the political process through the appointment of more black persons as

---

6. The plaintiffs appear to contend also that the mere fact that black persons are underrepresented among poll officials constitutes a violation of section 2. The plaintiffs appear to contend that this underrepresentation, by itself, reflects that black persons do not have equal access to the state political process. The court does not reach this contention at this time.

Another colorable contention presented by the plaintiffs is that the black underrepresentation is a vestige of the all-white primaries of the past. The facts in support of this contention have not been adequately developed yet, and the court has therefore not addressed the contention.

poll officials.[7] The following relief is minimally essential to achieving this goal for the upcoming elections:

(1) Each county appointing authority falling within the defendant class, discussed later, must comply with the following requirements in appointing poll officials:

A. The total number of black persons appointed as poll officials in each county must reasonably correspond to the percentage of black persons in the population of the county.

B. The number of black persons appointed as poll officials at each polling place in the county must reasonably correspond to the percentage of black registered voters assigned to that polling place; and reasonable effort must be made to assure that at least one black poll official is assigned to any polling place where black persons constitute at least 20% of the registered voters.

C. Appointments to particular offices at the polls—e.g., chief inspector, chief clerk, and returning officer—must be apportioned to black poll officials in a manner that reflects the percentage of black persons in the county.

(2) Each appointing authority falling within the defendant class must obtain the race of and keep a record of the race and name of all those nominated for poll officials and those appointed.

(3) The State Democratic Executive Committee must be required to notify each county Democratic Executive Committee of the above requirements for the appointment of black poll officials.

(4) The Governor and Attorney General of the State of Alabama must be required to coordinate the efforts of the county appointing authorities to meet the above requirements regarding the appointment of black poll officials and must take all steps necessary to assist the appointing authorities in meeting the requirements.

(5) To the extent necessary to meet the above requirements for the appointment of black poll officials, county appointing authorities falling within the defendant class must be allowed to appoint poll officials from sources other than those authorized by law.

Although the section 2 violation depicted above is state-wide and is not dependent on the circumstances within any particular county, the court will delay implementation of the above relief until August 17, 1984, so as to give each county appointing authority an opportunity to respond in writing and to be heard in open court before it is preliminarily determined that the county should be required to meet the above requirements for the appointment of black poll officials. Thus, an opportunity will be given to individual county appointing authorities to challenge the preliminary findings of the court, if they wish to do so. Furthermore, in at least two instances the plaintiffs agree that the requirements should not apply:

(1) counties where, according to the 1980 federal decennial census, no census tract or enumeration district has a black population that exceeds 5% of the total population in the census tract or enumeration district; or

(2) counties where in the general elections of November 1982 and November 1983 and the presidential primary election of March 1984, the total number of black persons appointed as poll officials throughout the county was equal to or greater than 95% of the number of black persons who would have been appointed had the percentage of black poll officials been equal to the percentage of black persons in the population of the county.

Any county satisfying either of these two circumstances would not be subject to the

---

7. The Governor and the Attorney General have challenged the need for them to be defendants in these proceedings. The wrong described above was the result of conscious, planned efforts by state officials in the past. It follows that state officials today should now assist in correcting this wrong.

requirements for appointment of black poll officials.

The court also recognizes that a statewide primary election is scheduled for September 4, 1984, and that some county appointing authorities may have some difficulty meeting the requirements for appointment of black poll officials by the time of this election. Appointing authorities, falling within the defendant class, will therefore be required to take affirmative and effective steps to achieve the requirements as nearly as possible for the September 4 primary.[8] However, for all other future primary, general and special elections, the authorities must, absent good and clear cause, fully comply with the requirements until further order of the court.

### B. Irreparable Injury

■ Since the plaintiffs seek preliminary injunctive relief pursuant to section 2 of the Voting Rights Act of 1965, as amended, they should not be and are not required to make the usual showing of irreparable injury as a prerequisite to relief; rather, such injury is presumed by law. First of all, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964). As a result, any illegal impediment to the right to vote, as guaranteed by the U.S. Constitution or statute, would by its nature be an irreparable injury. *Cf. id.*, 377 U.S. at 585, 84 S.Ct. at 1393 (once it has been established that a legislative plan violates the one-person one-vote principle, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan"). Moreover, section 2 and its history reflect a strong national mandate for the immediate removal of all impediments, intended or not, to equal participation in the election process. Thus, when section 2 is violated the public as a whole suffers irreparable injury. *See Middleton-Keirn v. Stone*, 655 F.2d 609, 611 (5th Cir. September 8, 1981) (Unit B) (irreparable injury will be presumed in case where employee seeks preliminary injunction in Title VII employment discrimination case).

Notwithstanding the above, the plaintiffs have demonstrated irreparable injury. Primary and general elections for national, state and local offices are imminent. Unless this court grants the preliminary injunctive relief requested, the political process will remain, as it was in the past, beyond the reach of many black voters across the State of Alabama, in particular the many who are elderly or uneducated.

### C. Relative Harms

The relief which the court will impose, while significant, will not disrupt or unreasonably burden the state and county political process. This relief will not result in a flood of new, inexperienced black poll officials.[9] In the overwhelming majority of counties, the poll officials will still be white by a substantial majority.

But more importantly, the appointing authority for Pike County has indicated to the court that since the filing of this lawsuit they have substantially increased the percentage of black poll officials to reflect the percentage black population in the county. There is no evidence that the Pike County appointing authority has been unduly burdened or its political process disrupted by these increased black appointments. And, similarly, the court has before it evidence that other county appointing authorities, in the wake of the filing of this lawsuit, have taken it upon themselves to increase the percentage of black poll officials, without apparent disruption of the political process

---

8. On this point, the court is giving the appointing authorities the benefit of the doubt. It appears that with some extra effort the authorities can substantially increase the number of black poll officials. *See* Part II–3 of this memorandum opinion. Also by law, authorities may not appoint poll officials earlier than 20 days before an election. 1975 Ala.Code § 17–6–1. Thus, the poll officials for the upcoming primary should not have been selected yet.

9. Of course, these black poll officials, like white poll officials, may be and should be trained.

**136**

in these counties. If anything, the solid empirical evidence is that substantial increases in black poll officials may be achieved easily and quickly, if there is a will to do so.

Therefore, if upon final judgment it should be determined that the plaintiffs are not entitled to the relief requested, no one will have been irreparably injured or harmed.

### D. Public Interest

As already noted, section 2 is a national public directive for immediate removal of all barriers to equal participation in the political process. In cases such as the present one, where the continued presence of such barriers is strongly evident, the public interest commands all appropriate relief necessary to effect the immediate and complete removal of these barriers.

### III. CLASS CERTIFICATIONS

Named plaintiffs, Harris and Batie, seek certification of both a plaintiff class and a defendant class under Fed.R.Civ.P. 23(a) and (b)(2), whose five requirements are as follows.

The first requirement is that the class must be "so numerous that joinder of all members is impracticable." Rule 23(a)(1). The second requirement is that there must be questions of law or fact common to the class. Rule 23(a)(2). The third requirement is that the claims or defenses of the representative parties must be typical of the claims or defenses of the class. Rule 23(a)(3). These second and third requirements "tend to merge" and are therefore usually considered together. *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2371 n. 13, 72 L.Ed.2d 740 (1982). They serve as "guideposts for determining whether under the particular circumstances maintenance of a class action is economical" and whether the named party claims or defenses and those of the class are "so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* The fourth requirement is that "the representative parties will fairly

and adequately protect the interest of the class." Rule 23(a)(4). And the fifth and last requirement is that the "party opposing the class" must have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2).

### A. Plaintiff Class

■ The named defendants have not contested certification of a plaintiff class. Nevertheless, meeting its responsibility to determine independently whether a plaintiff class is appropriate, the court finds, for reasons which follow, that such a class is due to be certified.

Since the named plaintiffs seek to represent all black citizens of the State of Alabama, there is no question but that the class meets the numerosity requirement.

The members of the class are asserting one claim: that black persons are underrepresented as poll officials throughout Alabama and that this fact diminishes black access to voting due to circumstances which prevail in Alabama. Thus, the requirements of commonality and typicality have been met.

The named plaintiffs have conscientiously pursued this lawsuit, and the legal representation exhibited so far by their counsel has clearly been adequate. The adequacy of the representation requirement has thus been met.

Finally, the relief sought by the named plaintiffs appears to be appropriate to the class as a whole, should the class finally prevail on the merits. Thus, the last requirement of Rule 23 has been met.

### B. Defendant Class

■ The named defendants contend that a defendant class may not be certified. Their contention is without merit.

The putative defendant class clearly meets the numerosity requirement. The class, consisting of approximately 198 members, is too numerous for joinder of all members.

As already stated, the claim of diminished black voter access to the polls due to underrepresentation of black poll officials is based on state-wide circumstances. Thus, any defenses to the claim would be state-wide, and would be common and typical for all members of the class. The commonality and typicality requirements have therefore been met.

The court is convinced that there is adequate representation. First, there is no apparent antagonism between the interests of the class and those of defendants State Governor, State Attorney General, and the members of the Pike County appointing authority. Second, counsel for defendants State Governor, State Attorney General and the Circuit Clerk of Pike County have vigorously and conscientiously pursued all necessary and appropriate defenses applicable to all members of the class. *See* Note, *Defendant Class Actions*, 91 Harv. L.Rev. 630, 639–40 (1978). Nonetheless, the court will allow a period of time prior to the effective date of any injunctive relief during which the appointing authority of any county dissatisfied with the present representation may request to be joined as a named defendant, and may present to the court any defenses inadequately presented or not already presented.

Finally, the relief described by the court is for the most part appropriate and applicable to the defendant class as a whole.

Therefore, since all necessary Rule 23(a) and (b)(2) requirements have been met, a defendant class is due to be certified.[10] *See, e.g., Doss v. Long,* 93 F.R.D. 112, 120 (N.D. Ga.1981) (state-wide defendant class of municipal judges and justices of the peace); *Tucker v. City of Montgomery,* 410 F.Supp. 494, 499 (M.D.Ala.1976) (three-judge court) (state-wide defendant class of municipal court presiding officials); *Ruocco v. Brinker,* 380 F.Supp. 432, 433 (S.D. Fla.1974) (three-judge court) (state-wide defendant class of state court clerks); *Kane v. Fortson,* 369 F.Supp. 1342, 1343 (N.D. Ga.1973) (three-judge court) (state-wide de-

fendant class of election officials); *Wilson v. Kelley,* 294 F.Supp. 1005, 1009 (N.D.Ga.) (three-judge court), *aff'd mem,* 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968) (state-wide defendant class of sheriffs, county wardens and municipal police chiefs); *Washington v. Lee,* 263 F.Supp. 327 (M.D.Ala.1966) (three-judge court) *aff'd per curiam,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (state-wide defendant class of county sheriffs and city wardens).

## IV. CONCLUSION

In conclusion, the evidence before the court reflects that there is gross underrepresentation of black persons among poll officials across the state; that in view of past history and present circumstances, this underrepresentation will substantially impede and impair the access of black persons to the state political process, in particular the ability of black persons to vote in the upcoming primary and general elections; and that this underrepresentation may be corrected quickly and easily and without any disruption of the political process. The evidence further reflects that plaintiff and defendant classes are due to be certified. Under these circumstances, the relief afforded by the court today is warranted.

An appropriate order will be entered.

## ORDER

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That this action be and it is hereby declared properly maintainable as a class action with respect to both a plaintiff class and a defendant class;

(2) That a class consisting of all black citizens of the State of Alabama be and it is hereby provisionally certified as the plaintiff class, to be represented by the named plaintiffs Charlie Harris and Mose Batie;

(3) That a class consisting of the appointing authority of each county of the State of Alabama except Conecuh County—that is,

---

**10.** However, Conecuh County, Alabama will be excluded from the defendant class because it has already entered into a consent decree in

another district court regarding the issue raised by this lawsuit.

the probate judge, clerk of the circuit court, and sheriff of each county—be and it is hereby provisionally certified as the defendant class, to be represented by the appointing authority of Pike County, Alabama; and

(4) That the named defendants' June 25, 1984, motion in opposition to certification of a defendant class be and it is hereby denied.

It is further ORDERED that, effective August 17, 1984, the appointing authorities within the defendant class and each individual member of those appointing authorities be and are hereby ENJOINED and RESTRAINED from failing to take affirmative and effective steps toward achieving as nearly as possible the following requirements for the appointment of black poll officials for the upcoming September 4, 1984, primary election; and they are further ENJOINED and RESTRAINED from failing to comply with, absent clear and good cause, these requirements for all other future primary, general and special elections until further order of the court:

(1) That the total number of black persons appointed as poll officials in each county shall reasonably correspond to the percentage of black persons in the population of that county;

(2) That the number of black persons appointed as poll officials at each polling place shall reasonably correspond to the percentage of black registered voters assigned to that polling place; and that all reasonable efforts shall be made to assure that at least one black poll official shall be assigned to any polling place where black persons constitute 20% or more of the registered voters assigned to that polling place;

(3) That appointments to particular offices at each polling place, such as chief inspector, chief clerk, and returning officer, shall be apportioned to black officials in a manner that reflects the percentage of black persons in the population of that county;

(4) That each appointing authority shall maintain a record of the name and race of each person nominated to be a poll official and of the name and race of each person appointed as a poll official;

(5) That no later than fifteen (15) days prior to the conducting of any election in which any defendant class member appoints poll officials, the defendant class member shall file with the clerk of this court a list showing the name, office (e.g., chief inspector, chief clerk and returning officer) and race of each person appointed as a poll official; and

(6) That to the extent necessary to meet the above requirements regarding the appointment of black poll officials, county appointing authorities within the defendant class may appoint poll officials from sources other than those authorized by state law.

It is further ORDERED that the State Democratic Executive Committee be and hereby is ENJOINED to notify immediately each county Democratic Executive Committee of the above requirements regarding the appointment of black poll officials.

It is further ORDERED that the Governor and Attorney General of the State of Alabama be and they are hereby ENJOINED to coordinate immediately the efforts of the county appointing authorities to meet the above requirements regarding the appointment of black poll officials and that the Governor and Attorney General shall take all measures necessary to assist the appointing authorities in meeting the above requirements.

It is further ORDERED that the appointing authority of each county of the State of Alabama except Conecuh County is hereby permitted until August 13, 1984, to file motions to intervene and written objections with the court stating reasons why it should not be included within the defendant class and/or why the relief granted above should not operate against it.

It is further ORDERED that any and all such motions and written objections be and they are hereby set for a hearing in the second floor courtroom of the federal courthouse in Montgomery, Alabama at 10:00 a.m. on August 15, 1984. All mem-

bers of the defendant class certified above shall comply with the terms of this order, in particular the requirements for appointment of black poll officials, unless excused by order of the court.

The clerk of the court is hereby DIRECTED to serve copies of this order and the accompanying memorandum opinion upon the members of the appointing authority of each county of the State of Alabama except Conecuh County.