**Ronald CHISOM, et al.,
Plaintiffs–Appellees,**

v.

**Buddy ROEMER, et al.,
Defendants–Appellants.**

No. 88–3492.

United States Court of Appeals,
Fifth Circuit.

Aug. 19, 1988.

Rehearing and Rehearing En Banc
Denied Sept. 14, 1988.

Robert G. Pugh, Sp. Asst. Atty. Gen., Shreveport, La., William J. Guste, Jr., Atty.

Gen., New Orleans, La., M. Truman Woodward, Jr., Moise W. Dennery, Blake G. Arata, A.R. Christovich, Sp. Asst. Attys. Gen., La. Dept. of Justice, New Orleans, La., for defendants-appellants.

Pamela S. Karlan, Charlottesville, Va., William P. Quigley, Roy Rodney, New Orleans, La., Charles Stephen Ralston, New York City, Ron Wilson, New Orleans, La., for plaintiffs-appellees.

Mark Gross, U.S. Dept. of Justice, Appellate Section, Civil Rights Div., Washington, D.C., for amicus curiae U.S.

Peter J. Butler, New Orleans, La., for amicus curiae Marcus.

Charles A. Kronlage, Jr., George M. Strickler, Jr., New Orleans, La., for amicus curiae Calogero.

Ira J. Rosenzweig, New Orleans, La., for amicus curiae Dixon.

Darleen Jacobs, New Orleans, La., for Brian C. Beckwith, New Orleans, La., for amicus curiae Jacobs.

Before CLARK, Chief Judge, GARZA and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

On August 3, 1988, following an expedited appeal, we vacated the preliminary injunction issued by the district court which had enjoined the election of a justice of the Louisiana Supreme Court from the First Supreme Court District, and ordered that "said election shall be conducted in accordance with the laws of the State of Louisiana at the times and in the manner specified therein." Consistent with a reserva- tion then made, we now assign our reasons for that decision.

## Background

On September 19, 1986 complainants, black registered voters in Orleans Parish, Louisiana, and an organization active in voting-rights issues, filed the instant suit, alleging that the present system of electing two justices to the Louisiana Supreme Court from the First Supreme Court District violates section 2 of the Voting Rights Act of 1965 as amended.[1] Their complaint was met with a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, which the court granted, essentially based on the conclusion that section 2 did not apply to judicial elections.[2] On appeal we reversed and remanded.[3]

After an application for panel rehearing and for a rehearing en banc was declined, the case was returned to the district court. Thereafter, complainants applied for a preliminary injunction to prevent the election scheduled for October 1, 1988 of a justice from the First Supreme Court District, a position held by Justice Pascal F. Calogero, Jr. since 1972.[4] Based on the evidence presented[5] the district judge concluded that the election should be enjoined. Defendants appealed and sought a stay pending appeal, Fed.R.App.P. 8. A divided motions panel of this court expedited the appeal and stayed the injunction to the extent it related to the qualifying activities of candidates. 850 F.2d 1051 (5th Cir.1988). As noted, after hearing the expedited appeal this merits panel vacated the remainder of the preliminary injunction.

## Factual Context

The thoughtful and comprehensive opinion of the trial court, which gleans the

---

1. 42 U.S.C. § 1973, as amended June 29, 1982, 96 Stat. 134. The complaint also alleges violations of the fourteenth and fifteenth amendments but only section 2 of the Voting Rights Act is involved in the preliminary injunction.

2. 659 F.Supp. 183 (E.D.La.1987). The court dismissed the constitutional claims for failure of allegations of discriminatory intent.

3. 839 F.2d 1056 (5th Cir.1988). All claims were reinstated.

4. Justice Calogero is the ranking Supreme Court justice, in terms of service, second only to Chief Justice John A. Dixon, Jr.

5. As observed by a member of this panel during oral argument, defendants made little attempt to offer evidence or other assistance to the trial court's efforts to decide the very difficult and serious issues presented by the application for a preliminary injunction.

sparse record and reaches out and takes judicial notice of other relevant judicially-found facts,[6] reveals the following factual scenario.

The Supreme Court of Louisiana is composed of "a chief justice and six associate justices, four of whom must concur to render judgment," who are elected for ten-year terms.[7] The justices are elected from six Supreme Court districts, all of which are single-member districts except the First Supreme Court District which elects two justices,[8] a tradition dating back more than a century. The districts and the number of justices assigned to each are "subject to change by law enacted by two-thirds of the elected members of each house of the legislature."[9]

The First Supreme Court District is largely composed of the metropolitan New Orleans area and includes four parishes: Orleans, Jefferson, St. Bernard, and Plaquemines. This district is the largest in population, with a 1980 census total of 1,102,253. The next largest Supreme Court district has a 1980 census population of just over 861,000, while the smallest contains approximately 411,000 Louisianans. The average of the five other districts, using 1980 census figures, is 620,729.

In 1980, the most recent data available to the trial court, the four parishes in the First Supreme Court District had the following population distribution:

| | | |
|---|---|---|
| Orleans | 557,515 | (55.25% black) |
| Jefferson | 454,592 | (13.89% black) |
| St. Bernard | 64,097 | ( 3.73% black) |
| Plaquemines | 26,049 | (21.12% black) |

Voter registration data as of March 31, 1987 reflected the following totals and percentages of black voters:

| | | |
|---|---|---|
| Orleans | 251,359 | (52.4% black) |
| Jefferson | 199,534 | (11.9% black) |
| St. Bernard | 40,086 | ( 3.9% black) |
| Plaquemines | 15,198 | (18.6% black) |

As the trial court found, at present blacks comprise a majority of the total population, the voting-age population, and the registered voters in Orleans Parish. Orleans Parish constitutes just over one-half of the total population of the First Supreme Court District.

The trial court concluded that complainants had satisfied the tetrad test for issuance of a preliminary injunction which was synthesized, although not originated, in the oft-cited case of *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974), by showing:

(1) a substantial likelihood that plaintiff will prevail on the merits;

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted;

(3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and

(4) that granting the preliminary injunction will not disserve the public interest.

### Analysis

Inasmuch as our decision is powered by a consideration of the essence and ramifications of the third and fourth factors, we pretermit a discussion of the first two, except for these limited comments. It remains to be seen whether the complainants will prevail on the merits, indeed the Supreme Court has yet to speak on the critical issue whether section 2 of the Voting Rights Act applies to judicial elections. And we can only speculate as to the state of the record in this case after trial on the merits.

As to irreparable injury, complainants urge a black-letter, *per se* rule to the effect that if an electoral standard, practice, or procedure abridges section 2 of the

---

6. Notably, the congressional redistricting case involving New Orleans and environs, brought pursuant to section 2 of the Voting Rights Act of 1965 as amended, *Major v. Treen*, 574 F.Supp. 325 (E.D.La.1983) (three-judge court), a case in which a great volume of evidence, vigorously tested by the adversarial process, was presented to the court.

7. La. Const. of 1974, Art. 5, § 3.

8. La. Const. of 1974, Art. 5, § 4 (incorporating La. Const. of 1921, Art. 7 § 9); La.R.S. 13:101.

9. La. Const. of 1974, Art. 5, § 4.

Voting Rights Act it automatically does irreparable injury to all or a portion of the body politic. Some district courts would agree. *See Dillard v. Crenshaw County,* 640 F.Supp. 1347 (M.D.Ala.1986); *Harris v. Graddick,* 593 F.Supp. 128 (M.D.Ala.1984); *Cook v. Luckett,* 575 F.Supp. 479 (S.D. Miss.1983). We do not. We are not prepared to adopt a *per se* rule in such a vital area of state-federal relations. We recognize and are in full accord with the teachings of the Supreme Court in *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964), that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise." We are cognizant, however, that " '[t]he possibility that ... other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.' " *Sampson v. Murray,* 415 U.S. 61, 70, 94 S.Ct. 937, 943, 39 L.Ed.2d 166 (1974) (*quoting Virginia Petroleum Jobbers Assn. v. FPC,* 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958)). In this we agree with the commentators who suggest that "[o]nly when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." Wright & Miller, *Federal Practice and Procedure* § 2948 at 431–34 (1973).

### Should the election be enjoined?

Assuming *per arguendo* that there has been a prima facie showing of likelihood of success on the merits, and irreparable injury, our disposition of this appeal turns on a negative response to the question: Does the public interest require that this election be enjoined? Would such an injunction be in the best interests of: all of the citizens of the State of Louisiana; the citizens of the First Supreme Court District; the black

citizenry of Louisiana; that of the First Supreme Court District; or the black electorate of Orleans Parish? We are persuaded beyond peradventure that the answer must be a resounding "no" on behalf of all of these groupings of Louisianians.

■ Our analysis begins with the staunch admonition that a federal court should jealously guard and sparingly use its awesome powers to ignore or brush aside long-standing state constitutional provisions, statutes, and practices. There can be no doubt that under the Supremacy Clause,[10] federal courts do and indeed must have this authority in our unique form of government. It is the use of this power that must be maintained in the balance, a balance which is more delicate than usual when a state's judicial process is involved.

■ It cannot be gainsaid that federal courts have the power to enjoin state elections. *Watson v. Commissioner's Court of Harrison County,* 616 F.2d 105 (5th Cir.1980); *Hamer v. Campbell,* 358 F.2d 215 (5th Cir.), *cert. denied,* 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966). But, "intervention by the federal courts in state elections has always been a serious business," *Oden v. Brittain,* 396 U.S. 1210, 90 S.Ct. 4, 24 L.Ed.2d 32 (1969) (Black, J., opinion in chambers), not to be lightly engaged in. Indeed, even after an adjudication on the merits that a legislative apportionment plan violated the Constitution, the Supreme Court invited the use of a velvet glove over the mailed fist:

In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

---

**10.** U.S. Const. art. VI.

*Reynolds v. Sims*, 377 U.S. at 585, 84 S.Ct. at 1394. *Sims* has been the guidon to a number of courts that have refrained from enjoining impending elections. In another instance, the Supreme Court stayed a district court's hand after a three-judge court found Indiana's multi-member districting provisions unconstitutional. *Whitcomb v. Chavis*, 396 U.S. 1055, 90 S.Ct. 748, 24 L.Ed.2d 757 and 396 U.S. 1064, 90 S.Ct. 761, 24 L.Ed.2d 757 (1970) (granting a stay pending appeal, 305 F.Supp. 1359, 1364 (S.D.Ind.1969)). *See also Maryland Citizens v. Governor of Maryland*, 429 F.2d 606 (4th Cir.1970); *Dillard v. Crenshaw County; Banks v. Bd. of Ed., City of Peoria*, 659 F.Supp. 394 (C.D.Ill.1987); *Knox v. Milwaukee County*, 581 F.Supp. 399 (E.D.Wis.1984).

We consider significant the Supreme Court's action in *Chavis*. In staying the reapportionment plan ordered by a three-judge court, the Supreme Court permitted the conduct of an election under the old scheme which had been found constitutionally infirm. In dissenting from the refusal to vacate their stay order, Justice Douglas pointedly stated: "The State contends that without a stay it will be forced to conduct the forthcoming election under the reapportionment plan of the District Court. By granting the stay, however, this Court has equally forced the appellees to go through the election under the present scheme which was held unconstitutional by the District Court." 396 U.S. 1064, 90 S.Ct. 761, 24 L.Ed.2d 757. Nonetheless the court permitted the election to proceed.

### The case at bar

■ Against this backdrop we consider the realities of the case at bar. The district court concluded that the issuance of an injunction would either be neutral, in ultimate result, or preferable to not enjoining the election. We do not find the court's reasoning persuasive. To the extent this is a factual finding by the trial court, we view it as clearly erroneous; to the extent it is a conclusion of law, we view it as erroneous.

Preventing this judicial election at this late stage is not a passive or neutral act. It is the proverbial gossamer-thin veil which is fraught with difficulties. The consequences to Louisiana's judicial system are as significant as they are uncertain. Indeed, the very uncertainties introduced account in large measure for the significance of the impact.

The core value of the law and its implementing judicial system is stability—the ability reasonably to anticipate the results of actions and proceedings, by individuals and by legal institutions. Staying the election for a justice of the First Supreme Court District casts a cloud over the Louisiana Supreme Court, as staying any judicial election would cast a cloud over the affected court. The Louisiana Constitution provides that the terms of the justices of its supreme court are ten years. The term of Justice Calogero expires on December 31, 1988. If the regularly scheduled election did not go forward, would Louisiana have seven justices on its highest court on January 1, 1989? If the election is enjoined and Justice Calogero continues to serve, will there be any question about the validity of his actions as a justice?

The Louisiana Constitution prescribes that four justices must concur to render judgment. Decisions in both civil and criminal cases decided on a 4–3 basis are not a rarity. The sparse offerings by the state in defense of the application for the preliminary injunction include the affidavit of the Director of the Louisiana Supreme Court's Central Staff of attorneys. He advises that since 1976 the Louisiana Supreme Court has reviewed 82 death penalty appeals. In 30 of those appeals the conviction was reversed or the death sentence was vacated. Twenty percent of those reversals were decided on a 4–3 vote. The record does not contain statistics for 4–3 renditions in civil cases, or in the denial of writs of certiorari or review, which require the agreement of four justices,[11] but the number undoubtedly is very substantial. One need only thumb through a selective sampling of the Southern Reporter Second

---

11. La. Const. of 1974, Art. 5, § 3.

series for a feel of just how substantial that number is. What is the consequence if Justice Calogero is one of the four? Is an uncertainty introduced?

Does the general statutory provision declaring that public officers hold their offices until their successors are "inducted into office" [12] apply in this instance? Our research reflects no case in which the Louisiana Supreme Court has applied this statute to a justice or judge. Until Louisiana's highest court resolves this question it remains just that, an open question and, as such, it casts a shadow on the functioning of the Louisiana Supreme Court.

Appellees and the trial court refer to the provision of the Louisiana Constitution which addresses the temporary posting of judicial vacancies. Article 5, § 22, provides that until a vacancy in a judicial office is filled "the supreme court shall appoint a person meeting the qualifications for the office ... to serve at its pleasure. The appointee shall be ineligible as a candidate at the election to fill the vacancy." *Id.* § 22(B). If the election is enjoined, after midnight on December 31, 1988 is the post now held by Justice Calogero to be deemed vacant and subject to an appointment by his former-fellow justices? Because of the involvement of the federal court, and its preventing of the election, would this be a vacancy subject to appointment? If it is deemed such and Justice Calogero accepts an appointment, would he be eligible to seek reelection to the judicial post he has held since 1972 when the federal court did permit an election to proceed? More shadows on the otherwise clear patina of the Louisiana judicial system. Are such warranted? Can they be justified or permitted?

Further, in Article 5, § 6, the Louisiana Constitution establishes that "[t]he judge oldest in point of service on the supreme court shall be chief justice." Justice Calogero currently is second in point of service to the chief justice. If the election is enjoined and his office is deemed vacant,

should he not be offered, or should he decline an appointment out of caution for the Article 5, § 22(B) proscription; if he is reelected, would his service have been interrupted so as to cause a forfeiture of his claim to be oldest in point of service?

Finally, what about the litigants during this period? What will be the racial demographics of that group? Will they be affected adversely? Will that effect be significant? Can it be justified?

Appellees suggest that the specter of problems with and for the Louisiana Supreme Court are manageable. The trial court states: "Regardless of the state constitutional provisions, this Court has in any event the power under the Supremacy Clause to fashion both preliminary and final equitable relief that will both provide plaintiffs with a full and adequate remedy and protect other important state interests." Is this a suggestion that the chancellor will appoint a successor to Calogero, perhaps Calogero, and, out of a sense of fair play, decree that all state constitutional questions as to his service are to be taken for naught, that the proscription against his running for the office is nullified, and, further, order that no one may suggest a break in his service for purposes of eligibility for the office of chief justice? Is such necessary? Should the federal court even contemplate that scenario? We are most reluctant to do so.

Were we to countenance such a scenario, other interests would be disserved. As the *Dillard* court recognized, the extension of the terms of incumbents or the court's appointment of replacements, effectively denies "the entire electorate the right to vote and thus seem to offend basic principles ..." *Dillard*, 640 F.Supp. at 1363. *See also, Banks*, 659 F.Supp. at 402 ("enjoining the ... election would have the effect of preventing all of the voters in the respective election districts from exercising their right to vote....")

How long would this disenfranchisement of all of the voters of the First Supreme

---

12. La.R.S. 42:2 provides:
   Every public officer in this state except in case of impeachment or suspension, shall continue to discharge the duties of his office until his successor is inducted into office.

Court District continue? As discussed *infra*, this case must run its full course, and, thereafter, assuming violations are found, the Louisiana Legislature must be afforded an opportunity to repair the defects the court discloses. Is the electorate to have no say whatever as to the person to serve during that period? Can that conceivably be considered in the best interests of the citizenry?

In addition to the foregoing caution to the use of injunctive powers before trial on the merits, and indeed even after trial on the merits, we are also keenly mindful of another well-established rubric which must be brought to bear in the resolution of the present conundrum. It is now established beyond challenge that upon finding a particular standard, practice, or procedure to be contrary to either a federal constitutional or statutory requirement, the federal court must grant the appropriate state or local authorities an opportunity to correct the deficiencies. In *Reynolds v. Sims* the Supreme Court commended the district court for refraining from enjoining an impending election until the Alabama Legislature had been given an opportunity to remedy the defects in their legislative apportionment scheme. 377 U.S. at 586, 84 S.Ct. at 1394. Further, after trial on the merits, and a declaration that an existing election scheme is unlawful, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional [or federal statutory] requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). *See also McDaniel v. Sanchez*, 452 U.S. 130, 150 n. 30, 101 S.Ct. 2224, 2236 n. 30, 68 L.Ed.2d 724 (1981) ("Moreover, even after a federal court has found a districting plan unconstitutional, 'redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt,'" *quoting Wise v. Lipscomb* ). The court goes on to cite authorities for the proposition that the legislatures should first be given a chance, and quoting *Reynolds v. Sims*, the *San-*

*chez* court noted that "judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." 452 U.S. at 150 n. 30, 101 S.Ct. at 2236 n. 30; *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Major v. Treen.*

As found by the district court, the Louisiana Legislature has signaled no reluctance to address this matter. When this court held that section 2 applied to judicial elections, remedial legislation was offered and seriously considered in the just-recessed legislative session. This legislature gives every indication of promptly responding to a need for action should it occur.

We understand these precedents to mandate that the responsible state or local authorities must be first given an opportunity to correct any constitutional or statutory defect before the court attempts to draft a remedial plan. In the case at bar, that means that should the court rule on the merits that a statutory or constitutional violation exists the Louisiana Legislature should be allowed a reasonable opportunity to address the problem. We have no reason whatsoever to doubt that the governor and legislature will respond promptly. Such was the experience in the epilogue to *Major v. Treen.*

In the interim, we are convinced that the system in place for the election of the subject judicial officer should be left undisturbed. There are a number of variables and several contingencies. But notwithstanding their final alignment, at the appropriate time, should it become necessary, the federal courts may fashion whatever remedy the law, equity, and justice require.

The preliminary injunction is VACATED and it is ordered that the presently scheduled election for justice of the First Supreme Court District of Louisiana proceed in accordance with the laws of Louisiana.