10 F.3d 226
 87 Ed. Law Rep. 394
 Shannon Richey FAULKNER, individually and on behalf of all
others similarly situated; United States of
America, Plaintiffs-Appellees,
v.
James E. JONES, Jr., Chairman, Board of Visitors of The
Citadel, the Military College of South Carolina; Carroll A.
Campbell, Jr., Member of the Board of Visitors of The
Citadel, the Military College of South Carolina; T. Easton
Marchant, Member of the Board of Visitors of The Citadel,
the Military College of South Carolina; Barbara S. Nielsen,
Member of the Board of Visitors of The Citadel, the Military
College of South Carolina; William F. Prioleau, Jr., Member
of the Board of Visitors of The Citadel, the Military
College of South Carolina; William E. Jenkinson, III,
Member of the Board of Visitors of The Citadel, the Military
College of South Carolina; Leonard C. Fulghum, Jr., Member
of the Board of Visitors of The Citadel, the Military
College of South Carolina; James M. Leland, Jr., Member of
the Board of Visitors of The Citadel, the Military College
of South Carolina; John A. McAllister, Jr., Member of the
Board of Visitors of The Citadel, the Military College of
South Carolina; Davis S. Boyd, Jr., Member of the Board of
Visitors of The Citadel, the Military College of South
Carolina; Julian G. Frasier, III, Member of the Board of
Visitors of The Citadel, the Military College of South
Carolina; Larry J. Ferguson, Member of the Board of
Visitors of The Citadel, the Military College of South
Carolina; Steve D. Peper, Member of the Board of Visitors
of The Citadel, the Military College of South Carolina;
Wallace I. West, Jr., Director of Admissions and Recruiting
at The Citadel, the Military College of South Carolina;
Claudius E. Watts, III, President of The Citadel, the
Military College of South Carolina; State of South
Carolina; The Citadel, the Military College of South
Carolina; The Board of Visitors of the Citadel, the
Military College of South Carolina, Defendants-Appellants.
 No. 93-2030.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 27, 1993.
Decided Nov. 17, 1993.
 
 Morris Dawes Cooke, Jr., Barnwell, Whaley, Patterson & Helms, Charleston, SC, Griffin Boyette Bell, King & Spalding, Atlanta, GA, Robert Holmes Hood, Hood Law Firm, Charleston, SC, argued (William A. Clineburg, Jr., King & Spalding, Atlanta, GA, Robert H. Patterson, Jr., William G. Broaddus, Anne Marie Whittemore, Frank B. Atkinson, McGuire, Woods, Battle & Boothe, Richmond, VA, on brief), for defendants-appellants.
 Valorie Kay Vojdik, Shearman & Sterling, New York City, David Kevin Flynn, Civ. Rights Div., U.S. Dept. of Justice, Washington, DC (Jonathan L. Greenblatt, Henry Weisburg, Shearman & Sterling, New York City, James P. Turner, Acting Asst. Atty. Gen., Thomas E. Chandler, U.S. Dept. of Justice, Washington, DC, Isabelle Katz Pinzler, Sara L. Mandelbaum, Women's Rights Project, Am. Civ. Liberties Union Foundation, New York City, Suzanne E. Coe, Silver & Coe, Greenville, SC, Robert R. Black, Charleston, SC, Stephen J. Henry, Taylor, Stephenson & Henry, Greenville, SC, on brief), for plaintiffs-appellees.
 Before HALL, NIEMEYER, and HAMILTON, Circuit Judges.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 Shannon R. Faulkner was conditionally admitted to The Citadel, a South Carolina state military college, to begin classes in the fall of 1993. When her female gender was discovered, however, The Citadel withdrew its acceptance in accordance with its 150-year-old policy of admitting only males. Faulkner then filed this suit to compel her admission, contending that the college's policy of excluding females violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.
 
 
 2
 The district court issued a preliminary injunction ordering that Faulkner be admitted to day classes at The Citadel, but not, consistent with her request, to its Corps of Cadets. Pending briefing and argument on appeal, we stayed the order, concluding that "public interest demands that resolution of an issue of such extraordinary complexity not be compressed into a proceeding solely to determine whether a stay is granted." Balancing the relative harms of the parties on a scale adjusted by the plaintiff's likelihood of success on the merits, we now conclude that the district court did not abuse its discretion in issuing the preliminary injunction and affirm.
 
 
 3
 * The Citadel, established in 1842, is a state-supported four-year military college, located in Charleston, South Carolina. Although it provides undergraduate, evening and graduate courses to a total student population of almost 3,800, The Citadel's unique undergraduate education incorporating a rigorous military training is made available only to its Corps of Cadets, consisting of approximately 2,000 students. By means of an adversative military methodology which the parties characterize as being similar to that employed by the Virginia Military Institute in Lexington, Virginia, described in United States v. Commonwealth of Virginia, 766 F.Supp. 1407 (W.D.Va.1991), The Citadel seeks, according to its mission statement, "to educate male undergraduate students as members of the South Carolina Corps of Cadets and to prepare them for postgraduate positions of leadership through academic programs of recognized excellence supported by the best features of a disciplined military environment and rigorous training." Throughout its 150-year history, The Citadel has maintained a policy of admitting only men to its Corps of Cadets. It has, however, admitted women to other educational programs.
 
 
 4
 Shannon R. Faulkner, as an honor student at Wren High School in Anderson County, South Carolina, applied for admission to The Citadel in January 1993. The Citadel was her first choice for college because she hoped "to attend a college in a military environment" and believed The Citadel's program to be "unique" in South Carolina and to offer "many advantages which [she] could not receive at any other college in South Carolina." The Citadel, not realizing that Faulkner was female,[1] admitted her on a provisional basis, as it does for every student. When The Citadel discovered that Faulkner was female a short time thereafter, it promptly revoked her admission.
 
 
 5
 Alleging that the male-only admissions policy of The Citadel denied her equal protection of the laws, Faulkner filed suit in March 1993. Shortly thereafter, in May 1993, the South Carolina General Assembly passed a joint resolution which affirmed a state policy of favoring single-gender educational institutions. The resolution declares that:
 
 
 6
 South Carolina has historically supported and continues to support single-gender educational institutions as a matter of public policy based on legitimate state interests where sufficient demand has existed for particular single-gender programs thereby justifying the expenditure of public funds to support such programs.
 
 
 7
 The General Assembly also formed a ten-member committee to examine the need for single-gender educational opportunities for women in South Carolina and to submit recommendations for the General Assembly to consider at the beginning of its 1994 session.
 
 
 8
 On July 8, 1993, Faulkner filed a motion in the pending litigation for a preliminary injunction mandating that she be permitted to attend day classes pending the outcome of the litigation. Her motion did not request that she be admitted to the Corps of Cadets. Faulkner argued that even The Citadel's expert testimony conceded that her attendance in the classroom only would not have harmful effects. On August 12, 1993, following a hearing, the district court granted Faulkner's motion for a preliminary injunction, concluding that the "irreparable harm that [Faulkner] will suffer if her constitutional rights are continued to be denied her far outweighs any irreparable harm The Citadel will sustain if she is admitted to the Day Program." Indeed, the court concluded that it was "unable to perceive of any significant irreparable harm or harm that will be suffered by The Citadel if this plaintiff is admitted to the Day Program."
 
 
 9
 This appeal followed, and, to allow for full briefing and argument, we stayed the effect of the district court's preliminary injunction and ordered an expedited schedule for briefing and argument.
 
 II
 
 10
 The Fourteenth Amendment, which was adopted after the Civil War to provide the newly-freed blacks with the same protection of the laws as that afforded to other persons, states in deceptively simple language, "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." Although the clause clearly provides that a law must apply with equal force to all persons within a class defined by the law, it does not require that a law, which is limited in its scope to a particular class, apply in the same way to persons outside of that class. While it may be popular to believe that the Equal Protection Clause prohibits distinctions even in classifications--for that conclusion is suggested by the overly generalized statement that "all men are created equal"[2]--the clause accommodates the opposite notion, that people are created differently. Fundamental injustice would undoubtedly result if the law were to treat different people as though they were the same. See Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971) ("Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike."). Thus, different classes are routinely defined by legislation without objection. For example, statutes limit the licensing of drivers to a class of persons 16 and over, or drinking to a class of persons 18 and over. In addition, classifications by gender have been utilized to require men to register for the draft, but not women, see Rostker v. Goldberg, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), and to qualify only men for employment in maximum security prisons, see Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). In short, the Fourteenth Amendment "does not deny to States the power to treat different classes of persons in different ways." Reed v. Reed, 404 U.S. 71, 75, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). When a regulation undertakes to define a class, however, the criteria for defining the class must be related to the purpose of the regulation. See Reed, 404 U.S. at 76, 92 S.Ct. at 254 (holding that Idaho statute which gives preference to the appointment of men over women as estate administrators violates the Equal Protection Clause).
 
 
 11
 We may thus begin the analysis for determining whether the equal protection of the laws is denied with the inquiry of whether the classification made has an appropriate relation to the purpose of the regulation. A regulatory classification which is made for a purpose unrelated to the purpose of the regulation, or which is broader than that appropriate for the regulation, may reveal prejudice and define discrimination. See e.g., Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (finding that a state's interest in regulating marriage is unrelated to race and therefore a statute prohibiting racially mixed marriages has "no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification").
 
 
 12
 Even when a classification is appropriately related to the regulation's purpose, we must weigh and evaluate the state's interest in accomplishing the regulation's purpose. Under the current equal protection jurisprudence, the adequacy of the state's purpose varies with the nature of the classification. Thus, a classification based on race or national origin or which affects fundamental rights secured by the Constitution is examined most closely because the classification is deemed inherently suspect. Only a compelling state interest, advanced by the least restrictive means, will justify the classification on these bases. See, e.g., Palamore v. Sidoti, 466 U.S. 429, 432-33, 104 S.Ct. 1879, 1881-82, 80 L.Ed.2d 421 (1984) (holding that custody decision based on race is not justified). On the other hand, classifications based on economic factors need only be rationally related to a legitimate governmental interest. See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439-40, 105 S.Ct. 3249, 3253-54, 87 L.Ed.2d 313 (1985) (applying rational basis test to economic and social legislation). A regulation that classifies by gender, such as that at issue in this case, is not subject to the same strict scrutiny as is one that classifies on the basis of race or national origin, due to the acknowledged differences between males and females, but it nevertheless demands more scrutiny than do economic regulations. See United States v. Commonwealth of Va. ("VMI"), 976 F.2d 890, 895-98 (4th Cir.1992), cert. denied sub nom., Virginia Military Institute v. United States, --- U.S. ----, 113 S.Ct. 2431, 124 L.Ed.2d 651 (1993). The scrutiny to be given regulations classifying by gender has been characterized as intermediate. "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." See Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). Legislative distinctions based on gender may thus be justified by an important governmental interest in recognizing demonstrated differences between males and females. But intermediate scrutiny will reject regulations based on stereotypical and generalized conceptions about the differences between males and females. See Hogan, 458 U.S. at 724-25, 102 S.Ct. at 3336-37; Frontiero v. Richardson, 411 U.S. 677, 684-85, 93 S.Ct. 1764, 1769-70, 36 L.Ed.2d 583 (1973).
 
 
 13
 These principles were applied to circumstances strikingly similar to those before us in the VMI case. In VMI, we accepted the district court's factual findings which recognized physical and psychological differences between men and women. The heart of VMI's military training program, aimed at producing citizen soldiers, depended on a methodology that reduced the cadets in training to an as-equal-as-possible status by physical and mental adversity, stress, deprivation of privacy, and minute regulation of behavior, and at the same time, relied on instilling values based on a strict code of conduct. While the evidence demonstrated that the adversative relationship of male against male tended to produce a desired result, an adversative relationship of male against female was believed to lead to different consequences. See VMI, 976 F.2d at 896. We also accepted the finding by the district court that if women were admitted to VMI, differences in physical ability between men and women, as well as concerns for privacy, would require VMI to adopt a "dual-tracking" program for training men and women in order to achieve equality in effect. This conclusion was based on the evidence that the military service academies, which are coeducational, found it necessary in every case to adopt dual-track programs for men and women. Id. We recognized, however, that dual-tracking would yield effects that might be unequal between the sexes, leading to jealousy and resentment. Id.
 
 
 14
 In light of the district court's findings, we concluded in VMI that coeducation would so fundamentally change VMI's military program that neither males nor females would receive the training which VMI offered through its single-gender program. "It is not the maleness, as distinguished from femaleness, that provides justification for the program. It is the homogeneity of gender in the process, regardless of which sex is considered, that has been shown to be related to the essence of the education and training at VMI." VMI, 976 F.2d at 897. With respect to the educational program, we observed that scientific studies offered into evidence supported the conclusion that single-sex education is pedagogically justifiable both for males and females. Id. Thus, with respect to both VMI's military and educational aspects, we held that a single-gender policy was justified by an important state purpose and that the state could appropriately offer a single-gender military education.
 
 
 15
 While providing a single-gender military education was held to constitute an appropriately important state purpose, we could find no state policy justifying Virginia's decision to offer this unique type of education only to men. VMI, 976 F.2d at 899. No evidence was presented that women might not also benefit from a program of military training designed to produce women citizen soldiers. The state offered only diversity as an announced justification. We concluded, however, that a policy of diversity is not advanced by the establishment of an institution for only one gender. Id. We remanded the case to the district court with instructions to elicit a plan from the state complying with the Fourteenth Amendment. We allowed for the possibility that a plan could still permit VMI to remain a state-supported single-gender institution, if that were the will of Virginia, so long as women were offered a parallel program. Id. at 900. The order in VMI did not, however, direct that any parallel program which the state might choose to provide be identical for both men and women.
 
 
 16
 In a circumstance where a gender classification is not justified by an acknowledged difference between men and women, the equality of treatment demanded cannot be satisfied by "separate but equal" facilities. See VMI, 976 at 898 n. 7. "Separate but equal" does not amount to equal. Thus, in the context of a racial classification which was not justified by the regulation's purpose, the requirement of equal treatment could not be satisfied by "separate but equal" treatment. See Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954). When, however, a gender classification is justified by acknowledged differences, identical facilities are not necessarily mandated. Rather, the nature of the difference dictates the type of facility permissible for each gender.
 
 
 17
 The point is illustrated by society's undisputed approval of separate public rest rooms for men and women based on privacy concerns. The need for privacy justifies separation and the differences between the genders demand a facility for each gender that is different. Therefore, any analysis of the nature of a separate facility provided in response to a justified purpose, must take into account the nature of the difference on which the separation is based, the relevant benefits to and the needs of each gender, the demand (both in terms of quality and quantity), and any other relevant factor. In the end, distinctions in any separate facilities provided for males and females may be based on real differences between the sexes, both in quality and quantity, so long as the distinctions are not based on stereotyped or generalized perceptions of differences.
 
 
 18
 That said about our decision in VMI, we come to the problem before us, whether the district court abused its discretion in entering a preliminary injunction, based on VMI, ordering that The Citadel admit Shannon Faulkner to day classes pending the outcome of the litigation on the merits.
 
 III
 
 19
 On the state of the record as it now exists, we can perceive no reason why our holding in VMI would not apply in this case. The Citadel is a state-supported military college not unlike the Virginia Military Institute, which was the subject of our holding in VMI.
 
 
 20
 South Carolina has demonstrated that, in contrast to Virginia's unwillingness to take a position in VMI, see VMI, 976 F.2d at 894, South Carolina has adopted a policy supporting The Citadel. A resolution adopted in May 1993 by both houses of the legislature embraced all the positive contributions of The Citadel and reaffirmed a policy of providing its benefits only to males.
 
 
 21
 While the announced South Carolina policy reaffirms The Citadel's positive contributions, it does not connect these values to a male-only characteristic. Rather, the values stated in the resolution would appear to relate to a single-gender policy for institutions. The resolution also offers no explanation for the failure to offer women the same opportunity to participate in a single-gender institution and achieve similar goals as that afforded to men at The Citadel. Although South Carolina has appointed a committee to review the absence of opportunity for women, the committee will not report to the legislature until January 1994.
 
 
 22
 Notwithstanding this difference, South Carolina has not hesitated to argue its case in reliance on VMI, contending that The Citadel should not be required to admit Faulkner and thereby impose coeducation, when this court was not prepared to impose coeducation in VMI. The argument is valid and, were it not for other circumstances present here, it might be determinative. In VMI, however, no preliminary injunction was sought. In this case, a preliminary injunction was sought and, in the judgment and discretion of the district court, was entered. The order imposed does not require structural changes to The Citadel's program. While the presence of a female in the day classes may be disruptive in the first days, an order permitting Faulkner's attendance is not tantamount at this time to integrating or altering the military program at The Citadel. The district court found in these circumstances that the irreparable injury to Faulkner, if the motion were to be denied, was "crystal clear," yet found that any injury to The Citadel was "minimal at best." Indeed, the court stated, "I am unable to perceive of any significant irreparable harm or harm that will be suffered by The Citadel if [Faulkner] is admitted to the Day Program." The evidence tends to support the finding. Dr. Richard Richardson, an expert in higher education and a consultant to the South Carolina Commission on Higher Education, stated that The Citadel could still maintain its primary mission, even if women were added to the classroom. Claudius E. Watts, III, the President of The Citadel, also testified that the academic offering and performance of men at The Citadel would not be affected by the admission of women. Similarly, Dr. Thomas W. Mahan, who has taught education and psychology at The Citadel for nearly twenty years, testified that there was no evidence to assume that admission of women would lower the performance of men academically. While such evidence does not address all the gains and losses that distinguish single-gender education from coeducation, we cannot say that the district court's factual findings are clearly erroneous. That nevertheless does not end our review.
 
 
 23
 In determining whether the district court abused its discretion in entering the preliminary injunction, we must still review the district court's evaluation of the continuing status of the parties pending the outcome of the litigation, focusing on the relative hardships that would result if the relief were to be granted. See Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802 (4th Cir.1991); Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir.1977). When weighing the potential harms, moreover, a court is required to keep sight of the relevant strengths of the parties' positions on the merits. Thus, while a substantial discrepancy in the potential harms would have to be found to favor a party whose potential for success on the merits was no better than even, less discrepancy in relative harms may suffice when that party's chances for success on the merits are probable.
 
 
 24
 In this case, ordering Faulkner to day classes will probably shake The Citadel's stability temporarily. However, the preliminary injunction will not change or destroy any material aspect of The Citadel's program. Moreover, no temporary adverse impact would be irreversible for The Citadel. Denying Faulkner's access, on the other hand, might likely become permanent for her, due to the extended time necessary to complete the litigation. The most telling aspect of this case, and that which distinguishes this case from VMI, is the presence of this time pressure, combined with an absence of present opportunity for Faulkner.
 
 
 25
 South Carolina is not prepared to provide an alternative remedy to Faulkner at this time, and it has not suggested one. Any alternative would have to await the results of the state committee's study, a court review of the committee's report, and implementation. In the meantime, current state policy denies Faulkner any relief to which she probably would be entitled in the long run, whether by attendance at The Citadel or at some other institution. Under these circumstances, we conclude that the district court did not abuse its discretion in entering the preliminary injunction for the limited, but temporary relief.
 
 
 26
 We are quick to note that the status imposed by the preliminary injunction is not permanent and does not determine the outcome on the merits. Those issues must await trial and findings by the district court. We trust that the court will proceed to hear the merits without undue delay, recognizing the importance of the interests of all parties which remain at stake.
 
 
 27
 AFFIRMED.
 
 K.K. HALL, Circuit Judge, concurring:
 
 28
 Notwithstanding this court's holding in VMI, I question whether, under the Equal Protection Clause, a state can ever have a sufficiently important interest to justify expending public funds to maintain an institution that not only practices inequality, but celebrates it.
 
 
 29
 Nevertheless, being bound by VMI, I concur in the opinion. I heartily concur in the result.
 
 HAMILTON, Circuit Judge, dissenting:
 
 30
 Without pause or demonstrated concern for the devastating consequences of its actions, the majority emasculates a venerable institution by jettisoning 150 years of impeccable tradition and distinguished service. Because the mandatory preliminary remedy imposed by the majority of this court is devoid of any showing of irreparable harm to Faulkner or a strong likelihood that Faulkner will succeed on the merits, decimates the status quo without first affording The Citadel an opportunity to justify its all-male admissions policy in a trial on the merits, frustrates the State of South Carolina's sovereign power by stripping its right to select and implement its own remedy upon the establishment of a constitutional violation, and conflicts with admonitions of the Supreme Court and this Circuit, I am constrained to dissent.
 
 
 31
 * To place this case in proper perspective, it is helpful to start with a discussion of the district court's findings resulting in its decision to issue the mandatory preliminary injunction. The district court began its analysis by finding that a denial of Faulkner's request for preliminary relief would irreparably harm her. In reaching this conclusion, the district court opined:
 
 
 32
 I think it's unfair to the plaintiff and an improper solution to the irreparable harm issue to consider only the extent to which her admission to the day program will diminish the harm suffered by her as a result of the denial of her constitutional right. I believe that she has been denied that constitutional right by not being admitted to The Citadel.
 
 
 33
 (J.A. 85). Thus, although the district court considered the preliminary relief "meager and ... inadequate," and recognized that the relief requested would not remedy the alleged equal protection violation, the district court nevertheless found that Faulkner would be irreparably harmed by the continued violation of her constitutional rights unless some form of preliminary relief was imposed. (J.A. 85, 87).
 
 
 34
 The district court then concluded, without providing any findings, that the mandatory preliminary injunction would not harm The Citadel. (J.A. 87). The district court next addressed Faulkner's likelihood of success on the merits. Remarkably, without regard to any proof proffered by The Citadel or the recognized pedagogical benefits of single-gender education, the district court found that our decision in United States v. Commonwealth of Virginia, 976 F.2d 890 (4th Cir.1992) (VMI ) compelled a conclusion that The Citadel's all-male admissions policy ipso facto violated Faulkner's equal protection rights. Believing the balance of harms weighed in Faulkner's favor and that she had a strong probability of establishing an equal protection violation, the district court concluded that Faulkner was entitled to a mandatory preliminary injunction requiring her admittance to day classes at The Citadel. The district court reasoned "[c]learly her irreparable harm caused by the denial of her constitutional rights will be diminished by the granting of that motion." (J.A. 87).
 
 II
 
 35
 Any analysis of the appropriateness for a preliminary injunction must begin with the admonition that "the grant of interim relief [is] an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 811 (4th Cir.1991) (quotation omitted). In Blackwelder Furn. Co. v. Seilig Mfg. Co., 550 F.2d 189, 194-97 (4th Cir.1977) and Direx Israel, 952 F.2d at 812, we outlined the precise analytical framework which courts must employ in determining whether to grant preliminary relief. First, the party requesting preliminary relief must make a "clear showing" that she will suffer irreparable harm if the court denies her request. Direx Israel, 952 F.2d at 812-13. A failure to establish irreparable harm "is by itself a sufficient ground upon which to deny a preliminary injunction." Gelco Corp. v. Conniston Partners, 811 F.2d 414, 418 (8th Cir.1987). Second, if that party establishes irreparable harm, "the next step then for the court to take is to balance the likelihood of irreparable harm to the plaintiff [from the failure to grant interim relief] against the likelihood of harm to the defendant [from the grant of such relief]." Direx Israel, 952 F.2d at 812 (inner quotations omitted).
 
 
 36
 Third, if the balance tips decidedly in favor of the party requesting preliminary relief, "a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." Id. at 813. However, "[i]f the balance does not tip decidedly, there must be 'a strong probability of success on the merits.' " Id. (quoting Frisch's Restaurant, Inc. v. Shoney's, Inc., 759 F.2d 1261, 1270 (6th Cir.1985)). Fourth, the court must evaluate whether the public interest favors granting preliminary relief.
 
 
 37
 On appeal, we review the lower court's decision to grant or deny preliminary relief under the abuse of discretion standard. In undertaking this review, however, Congress did not intend "appellate courts to be mere rubber-stamps save for the rare cases when a district judge has misunderstood the law or transcended the bounds of reason." Roland Machinery Co. v. Dresser Indus., 749 F.2d 380, 389 (7th Cir.1984). Thus, we have held:
 
 
 38
 Particularly where the appeal is from a grant of preliminary injunction, which represents the exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it, the standard of appellate review must not be reduced to the largely meaningless ritual of the typical abuse of discretion standard.
 
 
 39
 Direx Israel, 952 F.2d at 814 (inner quotations omitted).
 
 
 40
 Accordingly, the abuse of discretion standard in the present case "is not a rule of perfunctory appellate review[,] but one of careful scrutiny." Id. at 815. Applying our four-part analysis and the requisite careful scrutiny, it is pellucidly clear that the district court abused its discretion in granting the preliminary injunction.
 
 III
 
 41
 * Irreparable Harm
 
 
 42
 In analyzing the irreparable harm to Faulkner resulting from the denial of preliminary relief, the district court determined that it would be "an improper solution ... to consider only the extent to which her admission to the day program will diminish the harm suffered by her as a result of the denial of her constitutional right." (J.A. 85). In other words, the district court found it improper to begin its analysis by considering only the degree to which the preliminary relief would alleviate the alleged harms in determining whether the denial of that injunction would irreparably harm Faulkner. Logic demands otherwise.
 
 
 43
 Our jurisprudence requires a party requesting interim relief to establish that she will be irreparably harmed if the court denies the relief. Direx Israel, 952 F.2d at 812-13. It strains the bounds of reason to conclude that the refusal to impose interim relief, which admittedly fails to remedy a perceived constitutional violation and is considered "meager and ... inadequate," will inflict irreparable harm. (J.A. 85, 87). Instead, any inquiry into the irreparable harm resulting from the denial of interim relief must necessarily begin with an analysis of the degree to which that particular relief remedies the alleged injuries. If the relief requested does little, if anything, to alleviate the alleged injuries, it is difficult to comprehend how the refusal to grant that relief could cause irreparable harm.[1] Following the mistaken reasoning of the district court and the majority, if a party seeking to compel a state to provide her medication for cancer requested interim relief requiring the state to provide her with band-aids during the pendency of the litigation, the denial of that preliminary relief would ostensibly cause irreparable harm.
 
 
 44
 In the proceedings below and before this court, Faulkner asserted that, without the preliminary injunction requiring The Citadel to admit her to day classes, she would be irreparably harmed. Faulkner identified three primary sources of irreparable harm: (1) the denial of her constitutional rights; (2) the inability to begin the "bonding" process with her potential fellow cadets and professors; and (3) the denial of access to the network of Citadel alumni. As discussed in Part C, infra, Faulkner has failed, at this preliminary point in the proceedings, to establish any deprivation of her constitutional rights. Consequently, because the preliminary relief imposed by the majority fails to alleviate the second and third alleged injuries, Faulkner falls woefully short in her efforts to demonstrate irreparable harm.
 
 
 45
 Our decision in VMI compels the conclusion that the mandatory preliminary relief in the present case does nothing to alleviate the second and third injuries alleged by Faulkner. In VMI, a case strikingly similar to the instant matter, we expressly "accepted the district court's factual finding[ ]" that:
 
 
 46
 [T]he academic program at VMI is not unique.... [T]he most important aspect of the VMI experience occurs in the barracks ... [which] are designed to reduce all cadets to the lowest common denominator, from which the new cadet training system, class system, honor code, military system and academic system year-by-year builds the values, attitudes and behaviors expected from VMI graduates.... Producing a VMI graduate without the barracks experience would be equivalent to dressing someone up in a uniform of a Marine without first sending them to boot camp.
 
 
 47
 VMI, 976 F.2d at 892 (incorporating United States v. Commonwealth of Virginia, 766 F.Supp. 1407, 1423, 1424 (W.D.Va.1991)).
 
 
 48
 The Citadel provides a remarkably similar, if not identical, program. Thus, even though its classroom education provides an important part of The Citadel experience, by itself, it contributes little to the overall objectives of The Citadel program. Instead, The Citadel accomplishes its holistic and egalitarian goals primarily through other aspects of its program, such as the barracks life and the rigorous physical training. Because the preliminary remedy in the present case fails to provide these quintessentials--the meat and potatoes of The Citadel's program--to Faulkner, I believe her attendance at The Citadel's day classes will neither further Faulkner's ultimate desire to receive the full Citadel experience, nor afford her a substantial opportunity to "bond" with other cadets. Faulkner does not seek to "bond" with other cadets as a day student, but rather as a full-fledged member of the Corps of Cadets. The preliminary relief mandated by the majority does nothing to further this goal.[2] Moreover, graduating from The Citadel after merely attending day classes will, undoubtedly, separate Faulkner from other Citadel alumni who endured the other rigorous aspects of that institution's holistic and egalitarian program. Because the preliminary injunction does little, if anything, to ameliorate the injuries which would allegedly result from Faulkner's exclusion from The Citadel's day classes, missing the classroom experience pending the outcome of this litigation certainly imposes no irreparable harm on Faulkner.
 
 B
 Harm to The Citadel
 
 49
 Faulkner's inability to establish irreparable harm "is by itself a sufficient ground upon which to deny a preliminary injunction," Gelco Corp., 811 F.2d at 418. Nevertheless, an analysis of the harm to The Citadel resulting from the mandatory preliminary injunction provides an alternative basis for denying the interim relief sought. Specifically, because the relative harms to each party do not weigh decidedly in Faulkner's favor, Faulkner bears the heavy burden of demonstrating "a strong probability of success on the merits." Frisch's Restaurant, Inc., 759 F.2d at 1270. As discussed in Part C, infra, Faulkner failed to make such a showing at this preliminary stage.
 
 
 50
 The majority believes that an order allowing Faulkner to attend day classes imposes little if any harm on The Citadel. The majority reasons: "While the presence of a female in the day classes may be disruptive in the first days, an order permitting Faulkner's attendance is not tantamount at this time to integrating or altering the military program at The Citadel." Op. at 233. The contrary is true.
 
 
 51
 Faulkner's motion for class certification currently looms before the district court. The putative class, as currently defined, includes "all people who have been denied admission to The Citadel because they're female." (J.A. 68). The district court already announced an inclination to grant certification. (J.A. 64). If the district court grants certification, then all putative class members will be entitled to the same relief afforded the class representative. Requiring The Citadel to admit a large number of females to its day classes will undeniably disrupt The Citadel's program.
 
 
 52
 Moreover, I believe the mandatory preliminary injunction inflicts a more subtle, but no less substantial, injury on The Citadel. Specifically, the preliminary injunction harms The Citadel because it disrupts--in fact destroys--the status quo without first affording that institution an opportunity to defend on the merits. 11 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Sec. 2948 (1973) ("Arguably, the fact that [the] defendant would be ordered to act in a particular way, rather than be enjoined from engaging in certain action may make a mandatory injunction more burdensome in some cases.").
 
 
 53
 Courts routinely recognize that "the basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits." Chalk v. U.S. Dist. Court Cent. Dist. of Calif., 840 F.2d 701, 704 (9th Cir.1988). See also, Cordis Corp. v. Medtronic, Inc., 835 F.2d 859, 863 (Fed.Cir.1987); Blackwelder Furn. Co., 550 F.2d at 195. The "status quo" does not "consist of a photographic replication of the circumstances existing at the moment suit was filed," but rather "the last peaceable uncontested status that existed before the dispute arose." Massachusetts Mut. v. Associated Dry Goods, 786 F.Supp. 1403, 1427 (N.D.Ind.1992) (citing Washington Capitols Basketball Club, Inc. v. Barry, 419 F.2d 472, 476 (9th Cir.1969); Rees v. Panhandle Eastern Pipeline Co., 377 N.E.2d 640, 646 (Ind.App.1978); Mounce v. Bostic, 531 S.W.2d 887 (Tex.Civ.App.1976)). Thus, "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir.1979) (quoting Martinez v. Mathews, 544 F.2d 1233, 1243 (5th Cir.1976)). See also, Martin v. Int'l. Olympic Committee, 740 F.2d 670, 675 (9th Cir.1984); Dillard v. Crenshaw County, 640 F.Supp. 1347, 1362 (M.D.Ala.1986).
 
 
 54
 Remarkably, the majority wholly ignores these concepts, inflicting a remedy which decimates a status quo that has persevered with notable distinction and honor for 150 years. The majority does so at this preliminary stage of the litigation without first affording The Citadel an opportunity to defend its all-male admissions policy on the merits.[3] As Justice Scalia admonished:
 
 
 55
 Whether it is constitutional for a State to have a men-only military school is an issue that should receive the attention of this Court before, rather than after, a national institution as venerable as the Virginia Military Institute is compelled to transform itself.
 
 
 56
 Virginia Military Institute v. United States, --- U.S. ----, 113 S.Ct. 2431, 124 L.Ed.2d 651 (1993) (Scalia, J., dissenting) (emphasis added). Is The Citadel entitled to the same consideration as VMI? Obviously, The Citadel must be afforded this same opportunity to defend its all-male admissions policy on the merits before this court ravages such a long-standing tradition. The failure to provide this opportunity undeniably wreaks incalculable harm on The Citadel.[4]
 
 C
 Probability of Success on the Merits
 
 57
 At best then, the balance of harms does not "tip decidedly" in Faulkner's favor. Consequently, to obtain the preliminary relief sought, Faulkner must establish "a strong probability of success on the merits." Frisch's Restaurant, Inc., 759 F.2d at 1270. At this point in the proceedings, I believe Faulkner failed to make such a showing. However, even assuming arguendo that Faulkner established a strong probability of success, I think our jurisprudence, as well as compelling concerns of comity and federalism, nonetheless prohibits this court from imposing the preliminary relief ordered by the majority.
 
 
 58
 * Under the Equal Protection Clause of the Fourteenth Amendment, classifications based on gender may survive judicial scrutiny if they serve "important governmental objectives" and "the discriminatory means employed [are] substantially related to the achievement of those objectives." Mississippi University for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (quoting Wengler v. Druggists Mutual Ins. Co., 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980)). Even the majority in this case recognizes that "[T]he Fourteenth Amendment 'does not deny to States the power to treat different classes of persons in different ways.' " Op. at 230-31 (quoting Reed v. Reed, 404 U.S. 71, 75, 92 S.Ct. 251, 253-54, 30 L.Ed.2d 225 (1971)). However, the governmental objective may, under no circumstances, reflect "archaic and stereotypic notions" of men and women. Id.
 
 
 59
 In Hogan, 458 U.S. at 718, 102 S.Ct. at 3331, the Supreme Court applied these principles to a case similar to the one before us. There, the Supreme Court addressed a challenge to Mississippi's Nursing School admissions policy which excluded men. In evaluating a male applicant's equal protection challenge to this admission policy, the majority of the Court specifically rejected Justice Powell's dissenting view, which suggested that a policy favoring diversity of educational opportunities allows a state to provide single-sex education to only one gender. The majority reasoned:
 
 
 60
 The issue is not whether the benefitted class profits from the classification, but whether the state's decision to confer a benefit only upon one class by means of a discriminatory classification is substantially related to achieving a legitimate and substantial goal.
 
 
 61
 Id. at 731 n. 17, 102 S.Ct. at 3340 n. 17. However, the Court did not specifically find that providing single-gender education created a per se violation of the Equal Protection Clause of the Fourteenth Amendment. Instead, because "the record [was] flatly inconsistent with the claim that excluding men from the School of Nursing [was] necessary to reach any of MUW's educational goals," the Court found that MUW could not justify its single-gender admissions policy. Id. at 731, 102 S.Ct. at 3339-40.
 
 
 62
 In VMI, we also applied an equal protection analysis to facts resembling those in the present case. There, we found that the exclusion of women did not stem from archaic or stereotypical perceptions, but rather was necessary to accomplish VMI's educational goals. Specifically, we stated:
 
 
 63
 It is not the maleness, as distinguished from femaleness, that provides justification for the program. It is the homogeneity of gender in the process, regardless of which sex is considered, that has been shown to be related to the essence of the education and training at VMI.
 
 
 64
 VMI, 976 F.2d at 897. In other words, VMI's educational experience required equal treatment for all cadets in all aspects, as well as complete deprivation of privacy. Because of the physiological differences between men and women, VMI's program necessarily could, therefore, only admit one gender.
 
 
 65
 Nevertheless, we found VMI's all-male admissions policy violated the Equal Protection Clause. Although Virginia offered diversity in educational opportunities as a justification for VMI's all-male admissions policy, we held that diversity alone does not justify a state's decision to provide particular opportunities to only one gender. VMI, 976 F.2d at 899. Instead, a state must also reasonably explain its failure to provide opportunities to both genders. Because "the Commonwealth of Virginia [did] not reveal[ ] a policy that explains why it offers the unique benefit of VMI's type of education and training to men and not to women," we held that Virginia's policy favoring diversity did not justify that state's failure to provide a VMI-type education to women. Id. at 898.
 
 
 66
 Under this precedent, it is far from certain that The Citadel's all-male admissions policy violates the Equal Protection Clause. As in VMI, the record in this case unequivocally demonstrates that the exclusion of women is "necessary to reach [The Citadel's] educational goals." Hogan, 458 U.S. at 731, 102 S.Ct. at 3340. Specifically, the egalitarian, holistic environment at The Citadel requires that institution to remain single-gender.
 
 
 67
 Moreover, under our holding in VMI, a state policy favoring diversity in educational opportunities may justify single-sex, state-funded institutions; however if the opportunity is not provided to both sexes, the state must reasonably explain the discriminatory treatment.[5] In the present case, South Carolina proffered just such an explanation. Specifically, South Carolina announced a policy to promote diversity in educational opportunities by providing single-sex, state-funded institutions where there is sufficient demand. Pursuant to this policy, South Carolina claims its failure to provide an all-female, Citadel-type education stems from an inadequate demand for such an institution.
 
 
 68
 In furtherance of this policy, South Carolina's General Assembly formed a ten-member committee to examine the need (and presumably the demand) for single-gender educational opportunities for women in the State. The committee's report, due in January 1994, will contain recommendations for consideration by the General Assembly. This study and report, like any other discovery, may well affect a finding on the merits which is necessary to Faulkner's success or lack of success. Specifically, the study might "offer [an] explanation for [South Carolina's] failure to offer women the same opportunity to participate in a single-gender institution and achieve similar goals as that afforded men at The Citadel" by revealing a lack of sufficient interest by women for such an institution. Op. at 233.[6]
 
 
 69
 In light of these facts, the record, in its infant state, does not clearly establish a constitutional violation. Because Faulkner's probability of success on the merits is uncertain and the balance of harms does not tip decidedly in her favor, our precedent requires us to deny Faulkner's request for preliminary relief.
 
 2
 
 70
 My most pronounced disagreement with the majority stems from its decision blatantly to ignore concerns of comity and federalism and desecrate the State of South Carolina's right to select and implement its own remedy. For this reason, even if Faulkner had established a strong likelihood of success on the merits, the mandatory preliminary relief ordered by the majority would still be inappropriate.
 
 
 71
 Federal jurisprudence not only dictates, but demands that, upon finding a constitutional violation, federal courts must first afford the responsible state authorities an opportunity to devise and implement their own corrective action before imposing a judicially-created remedy. Only when the violation can be remedied through one particular method may a federal court, at the inception of the litigation, require the state to implement such corrective action. Concerns of comity and federalism require nothing less.
 
 
 72
 For example, in Brown v. Board of Education (Brown I ), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court ruled that segregation of students in public schools violated the Equal Protection Clause of the Fourteenth Amendment. However, in determining how to remedy this violation, the Court opined:
 
 
 73
 School authorities have the primary responsibility for elucidating, assessing and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles.
 
 
 74
 Brown v. Board of Education (Brown II ), 349 U.S. 294, 299, 75 S.Ct. 753, 755-56, 99 L.Ed. 1083 (1955). Thus, the Court refused to impose its own remedy for the equal protection violation, instead mandating that the lower courts "require ... the defendants [to] make a prompt and reasonable start toward full compliance ...," and ensure that the school officials proceed with "all deliberate speed" in devising a plan to admit those who had been discriminatorily denied entrance into the public schools. Id. at 300, 301, 75 S.Ct. at 756-57.
 
 
 75
 The Court further defined the role of federal courts in remedying constitutional violations in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). There, the Court opined:
 
 
 76
 Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults.
 
 
 77
 Id. at 16, 91 S.Ct. at 1276 (emphasis added). Thus, under Brown II and Swann, once a constitutional violation is established, courts must first afford the responsible state authorities an opportunity to devise and implement an appropriate remedy. Federal courts may impose their own remedy only if the responsible state authorities fail to take corrective action within a reasonable time.
 
 
 78
 Several lower courts have applied these principles in the context of preliminary injunctions. For example, in Chisom v. Roemer, 853 F.2d 1186 (5th Cir.1988), the Fifth Circuit denied black voters' request to preliminarily enjoin Louisiana's election scheme for its supreme court justices even though the court assumed the blacks would establish a prima facie claim for vote dilution. Specifically, the Fifth Circuit held "this case must run its full course, and, thereafter, assuming violations are found, the Louisiana Legislature must be afforded an opportunity to repair the defects the court discloses." Id. at 1192.
 
 
 79
 In reaching this conclusion, the Chisom court began with the "staunch admonition that a federal court should jealously guard and sparingly use its awesome powers to ignore or brush aside long-standing state ... practices." Id. at 1189. The court added:
 
 
 80
 It is now established beyond challenge that upon finding a particular standard, practice, or procedure to be contrary to ... a federal ... constitutional requirement, the federal court must grant the appropriate state ... authorities an opportunity to correct the deficiencies.
 
 
 81
 Id. at 1192 (emphasis added). Because a preliminary injunction would have deprived Louisiana of its right to devise and implement its own remedy, the Chisom court denied the black voters' request for such relief.
 
 
 82
 In VMI, we also recognized these principles, allowing Virginia, after the establishment of an equal protection violation, the opportunity to devise and implement its own remedy. Specifically, we stated "we do not mean to suggest the specific remedial course that the Commonwealth should or must follow hereafter ...," and outlined three possible remedies: (1) going private; (2) admitting women; or (3) creating a separate institution for women. VMI, 976 F.2d at 900. We added "[w]hile it is not ours to determine, there might be other more creative options or combinations." Id. In the present case, the majority, after reiterating with favor the principles adopted in VMI, merely "blinks at" our VMI precedent in passing, choosing to distinguish VMI on the premise that the instant matter contains "time pressure" and "an absence of opportunity for Faulkner." Op. at 233. These distinctions simply do not compel, let alone permit, a federal court to usurp the state's sovereign right to devise and implement its own remedy before or after a constitutional violation is established.
 
 
 83
 In Brown II, the same "time pressure" and "absence of opportunity" undeniably existed for the black students who had been excluded from white public schools for at least a hundred years. Yet the Supreme Court refused to impose a particular remedy on those states which had unlawfully discriminated even though it operated under the rubric of strict scrutiny. Instead, the Court "required the defendants [to] make a prompt and reasonable start toward full compliance ...," ordering the school officials to proceed with "all deliberate speed" in devising a plan to admit those who had been discriminatorily denied entrance into the public schools. Brown II, 349 U.S. at 300, 301, 75 S.Ct. at 756, 756-57. Moreover, in Swann, the Court cautioned that "[j]udicial authority enters only when local authority defaults." Swann, 402 U.S. at 16, 91 S.Ct. at 1276 (emphasis added).[7]
 
 
 84
 In my considered opinion, these principles preclude a federal court from imposing its own remedy, even on a preliminary basis, before the responsible state authorities have had an opportunity to devise and implement their own remedy. In the present case, South Carolina's General Assembly has initiated efforts to assess any purported constitutional flaws in its higher educational system by commissioning a ten-member committee to examine and report on the need for single-gender educational opportunities for women within the State. Because Faulkner's requested mandatory preliminary relief interrupts this remedial process and strips South Carolina of its right to devise and implement its own remedy, I would deny her request.[8]
 
 D
 Public Interest
 
 85
 Remarkably, the majority fails to even address this prong of our preliminary injunction analysis. Blackwelder Furn. Co., 550 F.2d at 194-97. For many of the reasons previously discussed, I believe the public interest would best be served by denying Faulkner's request for mandatory preliminary relief. As we have frequently noted, the public interest is best served by "preserving the status quo ante litem until the merits of a serious controversy can be fully considered by a trial court." Maryland Undercoating Co. v. Paine, 603 F.2d 477, 481 (4th Cir.1979). This principle applies with considerable force in the present case, because, at this stage, we have no showing of irreparable harm or a clear constitutional violation. Moreover, the public interest would be better served by refusing to "brush aside long-standing state ... practices" and impose a particular remedy without first affording South Carolina an opportunity to correct any deficiencies, if any exist, on its own. Chisom, 853 F.2d at 1189.[9]
 
 IV
 
 86
 For 150 years, The Citadel has duteously provided its Corps of Cadets with a unique educational experience, designed not only to provide a quality education, but also to develop character, honor and discipline. As we recognized in VMI, that experience hinges on the single-gender characteristic of The Citadel. Certainly, before The Citadel should be compelled to trash its tradition and exceptional educational experience, duty compels this court to afford The Citadel the right to present its argument in a full trial on the merits. Moreover, even if we were to conclude that The Citadel's long-standing tradition violates the Equal Protection Clause of the Fourteenth Amendment, our comity and federalism jurisprudence demand that we first provide the State of South Carolina the opportunity to create and implement its own remedy. Because the majority's decision blatantly ignores these requirements, I cannot join in its decision.
 
 
 87
 It follows that I would reverse.
 
 
 
 [1]
 Apparently, The Citadel's application form does not call for a statement of gender and Faulkner decided not to volunteer the information so that she could be "considered on the merits."
 
 
 [2]
 See Lincoln's Gettysburg Address ("Four score and seven years ago, our fathers brought forth upon this continent a new nation, conceived in liberty and dedicated to the proposition that all men are created equal.") and the Declaration of Independence ("We hold these Truths to be selfevident, that all Men are created equal.")
 
 
 [1]
 The majority applies the clearly erroneous standard to affirm the district court's finding that Faulkner would be irreparably harmed if the preliminary relief were denied. Op. at 233. However, because the district court's findings stemmed from an erroneous legal conclusion that it should not begin by considering the degree to which the preliminary relief ameliorates the alleged injuries, the de novo, rather than the clearly erroneous, standard of review should apply. See, e.g., Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 358 (4th Cir.1991) ("[A]n appellate court will overturn a district court's decision if made under an improper legal standard."). See also, Romberg v. Nichols, 953 F.2d 1152, 1156 (9th Cir.1992) ("We must reverse if the district court applied the wrong legal standard to reach [the factual findings]."); United States v. Rodriguez-Morales, 929 F.2d 780, 783 (1st Cir.1991) ("[T]he court of appeals reviews the district court's findings of fact ... under the clearly erroneous standard. Of course if the lower court applies the wrong legal standard, no deference attaches.")
 
 
 [2]
 Ironically, a majority of this panel reached the same conclusion when we granted The Citadel's motion for stay of the preliminary injunction pending appeal. Specifically, in that order we convincingly observed:
 [T]hat Faulkner's desire to become a member of the corps of cadets at The Citadel and obtain military education and training is not fulfilled by the preliminary injunction entered in this case, mandating that she be admitted to day classes only. To require South Carolina and The Citadel to admit her only to classes and thereby make only the classroom experience co-educational may not be materially different from requiring South Carolina to admit her to the University of South Carolina, also a state funded co-educational school of presumably comparable quality.... If ... a military education and training of the kind offered at The Citadel is the object, the preliminary injunction does not meet it.
 Faulkner v. Jones, No. 93-2030 Order at 3-4 (4th Cir. filed Aug. 24, 1993) (emphasis added).
 
 
 [3]
 Nowhere in its opinion does the majority suggest that "the facts and law clearly favor Faulkner." Anderson, 612 F.2d at 1114. Instead, the majority states only that "current state policy denies Faulkner any relief to which she probably would be entitled in the long run." Op. at 233. Our precedent clearly demands a stronger showing. Direx Israel, 952 F.2d at 808
 
 
 [4]
 As a final point, it has been suggested that Faulkner's tactics in gaining admission to The Citadel, i.e., surreptitiously eliminating any reference to her gender on document(s) accompanying her application, violated The Citadel's strict code of honor. The preliminary injunction, requiring The Citadel to admit Faulkner to its day classes, therefore inflicts an additional harm on The Citadel in that it deprives that institution of its right to treat Faulkner as it would any other student, e.g., to determine whether Faulkner violated the code of honor by misrepresenting her status on the document(s) accompanying her application and, if so, to administer the appropriate discipline: expulsion
 
 
 [5]
 The concurring opinion apparently would prefer that we reject outright our own precedent and hold that a state could never justify state-funded, single-gender education. Clearly, neither the Supreme Court nor this court has exhibited any proclivity towards adopting such an absolutist approach
 
 
 [6]
 The district court, in determining that Faulkner established a strong likelihood of success on the merits, failed to address these distinctions between the present case and VMI. Instead, the district court summarily concluded "[Faulkner's] likelihood of success in her case of obtaining equal protection of the law as defined in the VMI case is great." (J.A. 86)
 
 
 [7]
 The majority's reliance on an "absence of opportunity" as a justification for depriving the State of South Carolina the rights which we afforded the Commonwealth of Virginia in VMI astounds me. As this panel cogently observed in its prior order, South Carolina's other state-funded institutions can provide Faulkner with the same educational opportunities as do day classes at The Citadel. See, supra, n. 2
 
 
 [8]
 Faulkner claims that, upon establishing a constitutional violation, our precedent requires us to grant preliminary relief. In support, Faulkner relies primarily on Henry v. Greenville Airport Commission, 284 F.2d 631, 633 (4th Cir.1960), where we held "[t]he district court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right." Assuming arguendo that Faulkner established a clear constitutional violation, a matter yet to be litigated and decided, I believe our holding in Henry does not mandate preliminary relief in the present case
 In Henry, we dealt with the exclusion of blacks from various waiting rooms within the Greenville Airport. Thus, in that case the remedy was clear: Greenville would have to abolish its discrimination and allow blacks equal access to the waiting rooms. Such a remedy could be implemented instantaneously. In contrast, the remedy in the present matter is not so clear, nor can it be implemented so quickly. Instead, our decision in VMI allows The Citadel to pursue several possible remedies once an equal protection violation is established. The Supreme Court recognizes this distinction when determining whether a state should be afforded an opportunity to devise and implement its own remedy for constitutional violations. Watson v. City of Memphis, 373 U.S. 526, 532, 83 S.Ct. 1314, 1318, 10 L.Ed.2d 529 (1963) ("Desegregation of parks and other recreational facilities does not present the same kinds of cognizable difficulties inhering in elimination of [discrimination] in schools."). Thus, when there are "a number of variables and several contingencies" involved in remedying a constitutional violation, a federal court must refrain from usurping the state's right to devise and implement its own remedy. Chisom, 853 F.2d at 1192.
 
 
 [9]
 Even The Citadel acknowledges that, if its primary goal were to produce officers for the military, public interest would demand the integration of that institution. The Citadel: A Case for Single Gender Education (A. Mahan and T. Mahan) 1993 (J.A. 419). However, because "The Citadel's mission is clearly distinct from those of the four federal military academies ...," and utilizes the military environment only to effectuate its egalitarian and holistic goals, public interest demands that we preserve The Citadel's program until after a full trial on the merits. Id